FILED by _____ D.C.
ELECTRONIC

**Aug 2 2004**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Civil Action No. 04-80375-CIV-MIDDLEBROOKS/JOHNSON

| |
|---|
| IN RE SPEAR & JACKSON SECURITIES LITIGATION |

## MOTION AND INCORPORATED MEMORANDUM OF LAW TO STRIKE THE CERTIFICATIONS OF DAVID RAPPAPORT AND THEIR ACCOMPANYING LOSS CHARTS

### MOTION

Pursuant to the inherent authority of the Court, the Morningstar Group seeks to have the certifications of David Rappaport and their accompanying loss charts[1], both of which have been offered in support of the High Capital Funding Group's ("HCFG") Motion for Appointment As Lead Plaintiff and Approval of Lead and Liaison Counsel (DE #28), stricken for their failure to comply with the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. §78(j)(b) and 78(t)).  Because HCFG has not provided information necessary to properly correct its deficient certifications, the Morningstar Group now respectfully requests that the certifications and their accompanying transaction charts be stricken from the record, or in the alternative, order HCFG to provide an accurate accounting of its transactions in SJCK securities.

### LOCAL RULE 7.01 CERTIFICATION

Counsel for the Morningstar Group has contacted counsel for the Rozenas/HCFG Group in a good faith effort to resolve this dispute before filing this motion.  Despite this effort, a resolution could not be reached negating the need for this motion.

---

[1] See Exhibit B to the Declaration of Kenneth J. Vianale (DE #26).

Civil Action No. 04-80375-CIV-MIDDLEBROOKS/JOHNSON

## MEMORANDUM OF LAW

### I.     PROCEDURAL HISTORY

On June 1, 2004, Charles Rozenas moved for appointment as lead plaintiff (DE #16).  On June 21, 2004, three additional investor groups timely moved for appointment as lead plaintiff: HCFG (DE #22), the Spear & Jackson Investors Group (DE# 24) and the Morningstar Group (DE# 29).  On July 9, 2004, Charles Rozenas and HCFG sought consideration as a single movant group instead of as two separate competing Movants as initially filed.  (DE#35).  On July 13, 2004, the Morningstar Group filed a memorandum in opposition to the appointment of the Rozenas/HCFG (DE# 36) exposing material defects in HCFG's certifications and loss calculations.  The Rozenas/HCFG Group's reply on July 20, 2004 (DE #37) failed to adequately repair the defects in HCFG's certifications, and as a result, the Morningstar Group now moves to have the improper and deficient HCFG's certifications stricken.

### II.    HCFG HAS FAILED TO PROVIDE NECESSARY INFORMATION

The PSLRA mandates that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which … (iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." (15 U.S.C. §78u-4(2)(A)(iv)).  *See Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1320 (D. Ala. 2000) ("Certification requires a plaintiff seeking to serve in a representative capacity to put forward with his, her, or its motion such information from which the district court can evaluate the adequacy of that plaintiff against competitors under subsection 21D(a)(3)(B)(iii)(I)).  The certifications executed by David Rappaport under the penalties of perjury contain statements mischaracterizing the alleged losses of HCFG in SJCK securities.  HCFG and Charles J. Rozenas' recently filed memorandum in further support of their motions for lead plaintiff (DE # 37) was HCFG's opportunity to clarify the numerous issues raised by the

- 2 -

Morningstar Group with respect to the Rappaport certifications, but instead of rectifying its shortcomings, HCFG continued to provide only half the story.  HCFG now represents that the certifications' transactions questioned by the Morningstar Group involve options contracts, but the Morningstar Group could not locate a public market that trades SJCK options.  As discussed below, HCFG's explanations for the transactions called into question by the Morningstar Group fail to provide enough information to satisfy the PSLRA's requirements thereby rendering the certifications unreliable.  Because the certifications are inherently unreliable as a result of their failure to comply with the PSLRA's requirements, neither competing Movants nor the Court can accurately measure the HCFG's financial interest in this action.  Consequently, the certifications and their accompanying transaction charts should be stricken from the record.  *See Martinez v. Sanders*, 2004 U.S. Dist. LEXIS 10060, *9 (S.D.N.Y. June 3, 2004) (a court has inherent authority to strike matters which it deems improper).

### A. Deficient Certifications Do Not Meet the PSLRA's Requirements

The certifications executed by David Rappaport on June 9, 2004 declare that the accompanying transaction charts represent the transactions of Profit Concepts, LTD., Generation Capital Associates, First Mirage, Inc. and American Merchant Press, Inc. in the "common stock of Spear & Jackson, Inc. during the time period from January 30, 2002 to April 15, 2004 inclusive."  In response to the Morningstar Group's exposure of at least 140 HCFG transactions occurring outside the reported daily trading range for SJCK stock, HCFG now claims that those trades "were proper and reflect the sale of options, which do not trade at the same prices as common stock."  (DE# 37 at 2).  In *Singer v. Nicor, Inc.*, 2002 U.S. Dist. LEXIS 19884 (N.D. Ill. Oct. 16, 2002), the court held that all final loss figures must be calculated by the filing deadline, and, any later recalculations should be ignored.  By failing to provide the Court with an accurate

list of its trades and identifying whether they involved stock or other securities, HCFG has

neither properly identified all of its transactions nor accurately documented its loss, thereby

rendering it virtually impossible to determine its proper financial interest in this case.  *See In re*

*MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 436 (E.D. Va. 2000) (court denied motion of

a lead plaintiff movant because, among other reasons, movant could not demonstrate how it

arrived at its loss computation); *see also In re Williams Sec. Litig.*, No 02-CV-72 H(M) (N.D.

Okla. July 8, 2002) (Order) at p. 10 (attached hereto as Exhibit A) (faulting lead plaintiff movant

for failing "to provide sufficient information for the Court to analyze the basis for its claimed

financial interest").  In light of HCFG's revelation regarding its claimed options trades, the

Morningstar Group tried once again to ascertain HCFG's true financial interest in this action –

but could not.

### 1.      No Public Market Trades SJCK Options

Counsel has contacted the American Stock Exchange, the Chicago Board Options

Exchange, the Pacific Exchange, the Philadelphia Exchange, the International Securities

Exchange, Bloomberg, and the Options Clearing Corporation, and has been **unable to find a**

**public market for the trading of SJCK options**.  Not only do none of these exchanges trade

SJCK options, but Bloomberg and the Options Clearing Corporation do not have any price or

volume history for any SJCK options.  If the transactions in question involve options, HCFG

should provide evidence that the alleged options transactions occurred on a public market.

Moreover, if the 140 transactions in question were options transactions, the data provided

attached to the certification is insufficient to ascertain the profit/loss of the transaction.  A

movant must provide the ticker symbol (which contains corresponding codes for the strike price

and month) and cost of the option for the Court and other movants to accurately ascertain the

profit/loss of the transaction.  Because the Rappaport Certifications do not provide this

information, it is impossible to distinguish the stock transactions from the recently claimed options transactions.

### 2. HCFG's Claimed Options Trade "Confirmation" Creates Further Confusion

Attached as Exhibit B to the HCFG's most recent filing (DE #37), is a purported options trade confirmation. While it is unclear exactly what this document is, what is certain is that it is not a confirmation of an options trade. The confirmation states that 17,500 common stock shares of SJCK were sold at $3.3138 per share on a day when the reported trading range was between $10.15 and $11.23. If it is an options trade confirmation, as indicated, it should contain the appropriate ticker symbol, strike price and month. In addition, it is unclear why the document states that the broker is a "market maker" in the security – which would only apply to a stock transaction. HCFG has had the opportunity to present the Court and other Movants with all of the information necessary to accurately measure its financial interest, but has yet to do so and the appropriate time has passed. *See Singer v. Nicor, Inc.*, 2002 U.S. Dist. LEXIS 19884 (N.D. Ill. Oct. 16, 2002) (loss calculations must be accurate at deadline and subsequent recalculations should be ignored).

### 3. Options Contracts Trade in 100 Share Blocks

Rather than address the 140 trades that occurred outside the daily trading range, HCFG tries to distract the Court from the issue at hand by expanding the scope of their transactions from strictly common stock to now include options transactions and offering a single trade confirmation, discussed above, as evidence that all the out-of-range trades were options transactions. As any publicly traded options contact is for either the sale or purchase of 100 shares of the underlying stock, it is puzzling that so many transactions could have occurred in lots that are not multiples of 100 if they were options trades.

- 5 -

Civil Action No. 04-80375-CIV-MIDDLEBROOKS/JOHNSON

| Movant | Purchase Date | # of shares | Price Per Share | Day Low | Day High | Defect |
|---|---|---|---|---|---|---|
| Profit Concepts | 1/29/2003 | 434 | 7.4914 | 4.91 | 5.37 | Too high |
| Profit Concepts | 2/26/2003 | 310 | 7.4879 | 4.35 | 4.68 | Too high |
| Profit Concepts | 3/26/2003 | 310 | 7.4879 | 4.95 | 5.29 | Too high |
| Profit Concepts | 4/23/2003 | 310 | 7.4879 | 6.35 | 7.1 | Too high |
| Profit Concepts | 5/28/2003 | 161 | 7.4842 | 9.82 | 10.08 | Too low |
| Profit Concepts | 1/29/2003 | 419 | 0 | 4.91 | 5.37 | Too low |
| Profit Concepts | 3/26/2003 | 310 | 0 | 4.95 | 5.29 | Too low |
| Profit Concepts | 4/23/2003 | 310 | 0 | 6.35 | 7.1 | Too low |
| Profit Concepts | 5/28/2003 | 161 | 0 | 9.82 | 10.08 | Too low |
| Profit Concepts | 1/29/2003 | 419 | 0.9988 | 4.91 | 5.37 | Too low |
| Profit Concepts | 3/26/2003 | 310 | 0.9984 | 4.95 | 5.29 | Too low |
| Profit Concepts | 4/23/2003 | 310 | 0.9984 | 6.35 | 7.1 | Too low |
| Profit Concepts | 5/28/2003 | 161 | 0.9979 | 9.82 | 10.08 | Too low |
| Profit Concepts | 1/29/2003 | 434 | 0 | 4.91 | 5.37 | Too low |
| Profit Concepts | 2/26/2003 | 310 | 0 | 4.35 | 4.68 | Too low |
| Profit Concepts | 3/26/2003 | 310 | 0 | 4.95 | 5.29 | Too low |
| Profit Concepts | 4/23/2003 | 310 | 0 | 6.35 | 7.1 | Too low |
| Profit Concepts | 5/28/2003 | 161 | 0 | 9.82 | 10.08 | Too low |
| GCA | 5/7/2003 | 56 | 8.1123 | 8.3 | 8.65 | Too low |
| GCA | 5/12/2003 | 56 | 8.1061 | 8.95 | 10.5 | Too low |
| GCA | 5/15/2003 | 284 | 9.256 | 9.56 | 9.94 | Too low |
| GCA | 5/21/2003 | 284 | 9.742 | 9.91 | 10.05 | Too low |
| GCA | 5/28/2003 | 784 | 4.4888 | 9.82 | 10.08 | Too low |
| GCA | 6/4/2003 | 4,266 | 4.4888 | 9.9 | 10.16 | Too low |
| GCA | 4/23/2003 | 310 | 0.9984 | 6.35 | 7.1 | Too low |
| GCA | 5/28/2003 | 161 | 0.9979 | 9.82 | 10.08 | Too low |
| GCA | 1/29/2003 | 434 | 0 | 4.91 | 5.37 | Too low |
| GCA | 2/26/2003 | 310 | 0 | 4.35 | 4.68 | Too low |
| GCA | 3/26/2003 | 310 | 0 | 4.95 | 5.29 | Too low |
| GCA | 4/23/2003 | 310 | 0 | 6.35 | 7.1 | Too low |
| GCA | 5/28/2003 | 161 | 0 | 9.82 | 10.08 | Too low |
| First Mirage | 2/11/2003 | 430 | 5.2046 | 5.02 | 5.1 | Too high |
| First Mirage | 5/5/2003 | 349 | 8.1933 | 7.8 | 8.09 | Too high |
| First Mirage | 5/20/2003 | 5,468 | 9.9927 | 9.65 | 9.99 | Too high |
| First Mirage | 6/3/2003 | 540 | 10.0366 | 9.6 | 10 | Too high |
| First Mirage | 6/4/2003 | 787 | 10.1846 | 9.9 | 10.16 | Too high |
| First Mirage | 6/10/2003 | 518 | 11.4965 | 11.25 | 11.45 | Too high |
| First Mirage | 2/26/2003 | 1,106 | 3.1371 | 4.35 | 4.68 | Too low |
| First Mirage | 5/15/2003 | 963 | 3.3134 | 9.56 | 9.94 | Too low |
| First Mirage | 5/15/2003 | 937 | 3.3134 | 9.56 | 9.94 | Too low |
| First Mirage | 6/12/2003 | 518 | 3.3098 | 11.91 | 13 | Too low |
| First Mirage | 6/17/2003 | 11,326 | 3.3137 | 13.75 | 14.99 | Too low |
| First Mirage | 6/19/2003 | 65 | 3.3134 | 14.82 | 15.15 | Too low |
| First Mirage | 6/19/2003 | 335 | 3.3134 | 14.82 | 15.15 | Too low |
| First Mirage | 6/19/2003 | 865 | 14.3893 | 14.82 | 15.15 | Too low |
| First Mirage | 6/19/2003 | 135 | 14.3893 | 14.82 | 15.15 | Too low |

- 6 -

All of the above out-of-range transactions are lots that are not multiples of 100, therefore, none of them could have occurred as a result of an options trade.  In addition, if these were transactions involving options contracts, the price of the options contract itself would only be a fraction of the trading price of the underlying security, however, many of the transactions are close to the actual trading price of the stock.  Once again, as a result of HCFG's lack of complete information, it is impossible to accurately quantify HCFG's financial interest in this action.

## III.     CONCLUSION

Given HCFG's involvement in securities fraud only 7 years ago, the inaccuracies in the certifications of David Rappaport as to the types of transactions included in its loss calculations, the tremendous overstatement of losses, the improper inclusion of options trades when no public options market appears to exist, and the inclusion of 140 trades outside the daily trading range, the Rappaport certifications lack the necessary information required by the PSLRA to provide the Court with a clear view of its financial interest and should be stricken as improper and unreliable.

Dated:  August 2, 2004                              Respectfully submitted,

                                                    MILBERG WEISS BERSHAD &
                                                        SCHULMAN LLP


                                                    By:   s/.  Maya Saxena
                                                    Maya Saxena
                                                    Fla. Bar No. 0095494
                                                    msaxena@milbergweiss.com
                                                    Christopher S. Jones
                                                    Fla. Bar No. 0306230
                                                    cjones@milbergweiss.com
                                                    Joseph E. White, III
                                                    Fla. Bar No. 0621064
                                                    jwhite@milbergweiss.com

Civil Action No. 04-80375-CIV-MIDDLEBROOKS/JOHNSON

5355 Town Center Road
Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

-and-

**SCHIFFRIN & BARROWAY, LLP**
Stuart L. Berman
Darren Check
Sean M. Handler
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
Tel: (610) 667-7706
Fax: (610) 667-7056

**Proposed Co-Lead Counsel**

- 8 -

Civil Action No. 04-80375-CIV-MIDDLEBROOKS/JOHNSON

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail, postage prepaid, this 2nd day of August, 2004, to all counsel listed on the attached service list.

   s/.  Maya Saxena              

Maya Saxena

- 9 -

Civil Action No. 04-80375-CIV-MIDDLEBROOKS/JOHNSON

## Service List

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Maya Saxena
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**SCHIFFRIN & BARROWAY**
Andrew Barroway
Stuart L. Berman
Darren Check
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA  19004
Tel: (610) 667-7706
Fax: (601) 667-7056

**LERACH COUGHLIN STOIA &
ROBBINS, LLP**
Paul J. Geller
Jack Reise
197 S. Federal Highway, Suite 200
Boca Raton, FL  33432
Tel: (561) 750-3000
Fax: (561) 750-3364

**VIANALE & VIANALE LLP**
Kenneth J. Vianale
5355 Town Center Road, Suite 801
Boca Raton, FL 33486
Tel: (561) 391-4900
Fax: (561) 368-9274

**BERMAN DeVALERIO PEASE
TABACCO BURT & PUCILLO**
Michael J. Pucillo
515 N. Flagler Drive, Suite 1701
West Palm Beach, FL  33401
Tel: (561) 835-9400
Fax: (561) 835-0322

**MAGER WHITE & GOLDSTEIN**
Jayne Arnold Goldstein
2825 University Drive, Suite 350
Coral Springs, FL  33065
Tel: (954) 341-0844
Fax: (954) 341-0855

**LERACH COUGHLIN STOIA &
ROBBINS**
William S. Lerach
Darren Robbins
401 B Street, Suite 1700
San Diego, CA  92101
Tel: (619) 231-1058
Fax: (619) 231-7423

**JAMES B. DENMAN, P.A.**
James Burton Denman, III
2400 E. Commercial Boulevard, Suite 208
Fort Lauderdale, FL  33308-4030
Tel: (954) 938-9777
Fax: (954) 938-9789

**SCOTT & SCOTT, LLC**
David R. Scott
Neil Rothstein
Erin Green-Comite
108 Norwich Street
Colchester, CT  06415
Tel: (860) 532-5537
Fax: (860) 537-442

**SCOTT & SCOTT, LLC**
Edmund W. Searby
Walter W. Noss
33 River Street
Chagrin Falls, OH  44022
Tel: (440) 247-8200
Fax: (440) 247-8275

**SCOTT & SCOTT, LLC**
Arthur Shingler
401 B Street, Suite 307
San Diego, CA  32101
Tel: (619) 233-4565
Fax: (619) 233 0508

- 10 -

**JOHN CHAPMAN LIMITED**
John Chapman
700 W. Saint Clair Avenue, Suite 300
Cleveland, OH 44113
Tel: (216) 241-8172
Fax: (216) 241-8175

**ZIMMERMAN, LEVI & KORSINSKY
LLP**
Eduard Korsinsky
39 Broadway, Suite 1440
New York, NY 10006
Tel. (212) 363-7500
Fax. (212) 363-7171

**WECHSLER HARWOOD LLP**
Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**LASKY & RIFKIND, LTD.**
Leigh R. Lasky
100 Park Avenue
New York, NY  10017
Tel: (212) 907-0800
Fax: (212) 684-6083

**BRODSKY & SMITH, LLC**
Evan Smith
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Tel: (610) 667-6200
Fax: (610) 667-9029

**LAW OFFICES OF CHARLES J.
PIVEN, P.A.**
Charles J. Piven
401 E. Pratt Street, Suite 2525
Baltimore, MD 21203
Tel: (410) 332-0030
Fax: (410) 685-1300

**WOLF, HALDENSTEIN, ADLER,
FREEMAN & HERZ LLP**
Fred T. Isquith
270 Madison Avenue, 11th Floor
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 545-4653

**Counsel for Defendants:**

**ALLAN M. LERNER, P.A.**
Allan Michael Lerner
2888 E. Oakland Park Boulevard
Fort Lauderdale, FL  33306
Tel: (954) 563-8111
Fax: (954) 563-8522

**WICKER SMITH TUTAN O'HARA
McCOY GRAHAM & FORD**
Robert Chanderline Bauroth
515 E. Las Olas Boulevard, Sutie 1400
SunTrust Bank
Fort Lauderdale, FL  33301
Tel: (954) 467-6405
Fax: (954) 760-9353

**LEE & AMTZIS, P.L.**
Eric Lee
5550 Glades Road, Suite 401
Boca Raton, FL  33431
Tel: (561) 981-9988
Fax: (561) 981-9980

- 11 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

IN RE:                                        )        Case Nos.  02-CV-72-H(M)
                                              )                   **Lead Case**
WILLIAMS SECURITIES                           )
LITIGATION                                    )
                                              )
                                              )        **FILED**
                                              )
                                              )        JUL   8 2002
                                              )
                                              )        Phil Lombardi, Clerk
                                              )        U.S. DISTRICT COURT

**ORDER**

This matter comes before the Court on the motions to appoint lead plaintiff and lead counsel, filed on April 1, 2002 (Docket Nos. 16, 17, 19, 20, 25, 26, 34, 35, 38, 39).  The Court issued an order on June 21, 2002 (Docket No. 123) consolidating the four remaining related cases with Case No. 02-CV-72-H(M) and bifurcating the action into the following subclasses: purchasers of Williams Communications Group, Inc. ("WCG") securities and purchasers of Williams Companies, Inc. ("WMB") securities.  As contemplated by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(ii) and 15 U.S.C. § 77z-1(a)(3)(B)(ii), which requires the Court to appoint the most adequate plaintiff as the lead plaintiff for the consolidated action "as soon as practicable" after the decision on the motions to consolidate is rendered, the Court will now address the motions for appointment of lead plaintiff and lead counsel.

The Court has carefully reviewed the briefs submitted by the five lead plaintiff movants, and, for the reasons set forth below, hereby orders the appointment of Alex Meruelo as the lead plaintiff for the subclass of purchasers of WCG securities and HGK Asset Management ("HGK")

1

**EXHIBIT A**

as lead plaintiff for the subclass of purchasers of WMB securities.  The Court further orders the appointment of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), Weiss & Yourman, and Morrel West Saffa Craige & Hicks Inc ("Morrel West") as counsel for the subclass of purchasers of WCG securities and Schoengold & Sporn and the Seymour Law Firm as counsel for the subclass of purchasers of WMB securities.

I

The PSLRA sets forth detailed procedures for the appointment of lead plaintiff(s) in a private class action arising under the securities laws.  15 U.S.C. § 78u-4(a).[1]  Among those procedures is the requirement that the named plaintiff in the action must file notice within twenty days of filing suit to inform potential class members of their right to move to be appointed lead plaintiff.  15 U.S.C. § 78u-4(a)(3)(A)(i).  Such notice must be published "in a widely circulated national business-oriented publication or wire service."  Id.  Not later than sixty days after the date on which this notice is published, any member of the putative class may move the court to be appointed lead plaintiff of the class.  15 U.S.C. § 78u-4(a)(3)(A)(ii).

The PSLRA then requires the Court to appoint a lead plaintiff for the class after determining which applicant is "most capable of adequately representing the interests of the class members."  15 U.S.C. § 78u-4(a)(3)(B).  In determining which applicant should be named lead plaintiff, the Court must accept the presumption that the most adequate plaintiff in any private action is the person(s) who: (1) has either filed the complaint or made a motion in response to a

---

[1]  The PSLRA amended both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by adding identical sections to both acts, Section 27 to the Securities Act and Section 21D to the Exchange Act.  See 15 U.S.C. § 77z-1(a)(3) and 15 U.S.C. § 78u-4(a)(3).  For convenience, the Court will cite only to the Exchange Act when referring to the PSLRA.

2

notice; (2) in the determination of the Court, has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Under the PSLRA, the Court's determination of the "most adequate plaintiff" may be rebutted only upon proof that the presumptive lead plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## II

### A. Appointment of Lead Plaintiff for the WCG Subclass

On January 29, 2002, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(A)(i)(I), the first notice of the pendency of this class action was published in a national business-oriented wire service. See Press Release, Milberg Weiss Bershad Hynes & Lerach LLP, Milberg Weiss Announces Class Action Suit Against Williams Companies, Inc. and Williams Communications Group, Inc. (Jan. 29, 2002) (Seymour Decl. Ex. A). Within sixty days following the date of that publication, on April 1, 2002, lead plaintiff applications were submitted by the following individuals or groups, now seeking to be appointed lead plaintiff for the subclass of purchasers of WCG securities ("WCG Subclass"): Mr. Meruelo;[2] Blaine Watkins, Bruce and Kathleen Smith and Bruce Russell ("the Watkins Group"); and Market Street Securities, Inc. ("Market Street").[3]

---

[2]  The lead plaintiff application of Mr. Meruelo was originally submitted on behalf of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronayn ("the Meruelo Group"). In its June 6, 2002 memorandum, however, the Meruelo Group stated that, in light of the bifurcation of the action into subclasses of WMB and WCG securities purchasers, the group sought to put forward only Alex Meruelo as the proposed lead plaintiff.

[3]  Douglas E. Miller and Carol Moore, purchasers of WMB and WCG securities, jointly filed a motion seeking to be appointed lead plaintiff on April 1, 2002 (Docket Nos. 22 and 23). Mr. Miller and Ms. Moore have not submitted the additional briefing ordered by the Court to

3

Because all three lead plaintiff motions were submitted within the time period established by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), all applicants have satisfied the first requirement of the statutory test for determining the presumptive "most adequate plaintiff."

The Court must next determine the person or group of persons who "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The PSLRA, however, does not specify the procedure for the Court to follow in making this determination. See In re Enron Sec. Litig., 2002 WL 530588, at *7 (S.D. Tex. 2002); see also In re Nice Sys. Sec. Litig., 188 F.R.D. 206, 217 (D. N.J. 1999). Several courts addressing this question have applied the four-factor test articulated by the district court in Lax v. First Merchs. Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). See, e.g., Enron, 2002 WL 530588, at *7; In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); Nice Sys., 188 F.R.D. 206, 217 (D.N.J. 1999). The four Lax factors used to determine the largest financial interest are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. Lax, 1997 WL 461036, at *5. "These factors are useful because they look to relatively objective indicators, such as the number of shares purchased or sold, rather than to the ultimate question of damages." Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146 (N.D. Cal. 1999). Notably, one of the WCG Subclass movants in this case, despite the Court's request at the April 12, 2002 hearing for clear and specific information regarding loss calculations, failed to provide information stated in these terms. Accordingly, the Court has

---

support their motion, and, accordingly, the Court deems the motion to have been withdrawn. Westmonte Plaza Inc. (Docket No. 28) and Darryl Abramowitz (Docket Nos. 30 and 31) also filed lead plaintiff applications on behalf of WCG securities purchasers. Both applications, however, were formally withdrawn and, therefore, will not be addressed here.

4

focused its analysis on the movants' claimed losses, the only common denominator addressed by each of the WCG Subclass movants.[4]

On the basis of the losses claimed by the lead plaintiff movants, Mr. Meruelo appears to be the lead plaintiff applicant with the largest financial interest in the outcome of the litigation. The losses claimed by the respective movants are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| Alex Meruelo | $3,905,136.80[5] |
| Market Street | $2,300,000.00 |
| The Watkins Group | $ 224,000.00 |

Market Street argues, however, that Mr. Meruelo's losses are overstated and that instead Market Street is the movant with the largest financial interest.  Market Street attacks Mr. Meruelo's loss calculation on several grounds, claiming it is overstated because: (1) Mr. Meruelo made errors in his certifications and loss calculations; (2) Mr. Meruelo improperly

---

[4] The Court recognizes its obligation under the PSLRA to "determine" the plaintiff with the "largest financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (requiring that the "most adequate plaintiff" be the person or persons that, "in the determination of the court, has the largest financial interest in the relief sought by the class") (emphasis added); see also Aronson, 79 F. Supp. 2d at 1157.   The Court further recognizes, however, that the statutory scheme for the speedy resolution of the lead plaintiff question makes it undesirable for courts to prejudge damages through an extensive fact-finding process. See Aronson, 79 F. Supp. 2d at 1157.  The Court has reviewed the numerous motions and supporting memoranda addressing the lead plaintiff question and generally accepts the representations of the movants as true.  Based on these representations and the unnecessary delay that would be occasioned by further proceedings, Market Street's motion for oral argument (Docket No. 119) on these issues is hereby denied.

[5] See Notice of Submission of Corrected Loss Calculation and Trading Data by Alex Meruelo; Declaration of Behram V. Parekh, filed June 6, 2002, ("Corrected Loss Calculation").

5

included purchases after the disclosure of fraud; and (3) Mr. Meruelo improperly calculated his losses by using the average trading price of WCG during the 90-day period following the close of the class period. The Court will address each of Market Street's criticisms in turn below.[6]

First, Market Street criticizes Mr. Meruelo's certification and therefore his loss calculation, arguing that the certification listed "numerous trades in the common stock of WCG at prices outside the range at which WCG traded on those dates." Market Street then calculates the amount by which Mr. Meruelo's losses would be reduced if the Court rejected all trades listed on the certification at prices outside the range at which the stock traded on those dates, arguing that Mr. Meruelo's claimed losses should be reduced by $1,128,665.00.

On June 6, 2002, however, Mr. Meruelo submitted a Corrected Loss Calculation and actual trading data supporting his motion for appointment as lead plaintiff. The revised loss calculation was submitted to correct the following discrepancies: (1) the trading data attached to Mr. Meruelo's certification reflected settlement dates rather than trading dates for the stock; and (2) the trading data attached to Mr. Meruelo's certification included the commission charge as part of the price of the securities, rather than reflecting just the trade price of the securities. After correcting for these errors, Mr. Meruelo's losses amount to $3,905,136.80; a total more than the

---

[6] In its June 6, 2002 Response Memorandum, Market Street also argued that Mr. Meruelo's losses were overstated because the Meruelo Group and Mr. Meruelo: (1) failed to assign value to Mr. Paronyan's shares; and (2) improperly aggregated the claims of the individuals in the Meruelo Group. Because the other individual lead plaintiff applicants in the former "Meruelo Group" have withdrawn their applications in support of Mr. Meruelo, the Court need not address these arguments.

6

amount stated in Mr. Meruelo's original submission.[7]   The Court has reviewed the revised loss

calculations and supporting trading data and finds that the errors identified by Market Street (and

certain other lead plaintiff movants) have been sufficiently addressed.   Accordingly, the Court

finds unnecessary any reduction of Mr. Meruelo's loss calculation on the basis that the trade

prices stated on the certification are in error.[8]

Market Street next claims that Mr. Meruelo's losses are overstated because his

certification includes purchases of WCG securities effected after the disclosure of the fraud.

Market Street argues that Mr. Meruelo's purchases of 171,700 shares of WCG stock on January

29, 2002 should be excluded from his loss calculation because the WMB press release describing

the contingent guarantee of WCG debt was issued at 7:31 a.m. on January 29, 2002, before the

market opened for trading.

Mr. Meruelo contends, however, that the January 29 purchases were appropriately

included in his loss calculation because the class period alleged in the complaints filed in this

action end on and include January 29, 2002.  See, e.g., Cali, et al. v. Williams Cos. Inc., et al.,

Compl. at ¶ 18 ("Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

_____

[7] Mr. Meruelo's Corrected Loss Calculation explains that the increase in the amount of
loss is due to the inadvertent exclusion from his original submission of purchases that were
"settled" after the end of the class period but "transacted" within the class period.

[8] The Court finds that the corrected errors in Mr. Meruelo's certification and loss
calculation do not provide a sufficient basis for denying his motion to be appointed lead plaintiff.
Cf. Amended Memo. Of Law in Opp'n to the Competing Lead Plaintiff Motions and in Further
Support of the Motion of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis
Paronyan for Consolidation, Appointment as Lead Plaintiff and For Approval and Selection of
Lead and Liaison Counsel (4/19/02) ("The fact that none of the three certifications that were filed
by Market Street Securities was accurate, in and of itself, provides additional grounds for
denying its motion.").

otherwise acquired the securities of WMB and/or WCG between July 24, 2000 and January 29, 2002 inclusive (the 'Class Period') and who were damaged thereby") (emphasis added). Mr. Meruelo further contends that, in addition to the press release purportedly issued at 7:31 a.m., WCG issued its own press release on January 29, which may have contradicted WMB's prior statements. Mr. Meruelo argues that these conflicting press releases created confusion in the market regarding WMB and WCG's securities.

The Court finds that a determination regarding whether the shares purchased by Mr. Meruelo on January 29, 2002 occurred after the market became aware of the alleged fraud requires an extended inquiry and factual determination as to the exact moment investors were on notice of the negative information. The Court finds that such an inquiry is inappropriate and unnecessary at this stage of the litigation and, accordingly, declines to exclude Mr. Meruelo's January 29, 2002 purchases of WCG stock from Mr. Meruelo's loss calculation on that basis.

Finally, in addition to the criticisms of the trading prices stated in Mr. Meruelo's certification, Market Street also attacks the method by which Mr. Meruelo calculates his losses. Market Street argues that Mr. Meruelo's loss calculation, based on the PSLRA'S 90-day average trading price, 15 U.S.C. § 78u-4(e), is an inappropriate measure of loss at the lead plaintiff appointment stage.[9] Instead, Market Street argues that the appropriate measure of loss would be one based on the closing price for WCG common stock on January 29, 2002, the day the alleged fraud was disclosed. Market Street further argues that Mr. Meruelo's use of the 90-day average

---

[9] The PSLRA provides a limit on the amount of damages that can be recovered in a private action where the plaintiff seeks to establish damages by reference to the market price of a security. 15 U.S.C. § 78u-4(e)(1). That limit is calculated by determining "the mean trading price of [the] security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Id.

8

trading price is an attempt to claim "more than $1,700,000 worth of losses that occurred well after the disclosure of the fraud and the end of the class period."

Market Street cites the district court's decision in In re Ribozyme Pharms., Inc. Sec. Litig., 192 F.R.D. 656, 661 (D. Colo. 2000), to support its position that the 90-day average trading price should not be used to determine the lead plaintiff with the largest financial interest in the litigation. In Ribozyme, the court found that the loss calculation for the so-called "retention" plaintiffs was the value to which the stock price fell at the end of the class period; the court also explicitly rejected the use of the 90-day average trading price as a method for calculating damages:

> The "Lead Plaintiffs" Group argues against this novel valuation method and states that it is error to read the PSLRA's "90-day bounce back" provision regarding the calculation of damages into the lead plaintiff provision regarding the largest financial interest. I agree that the determination of financial interest does not equate to damages. Damages is a term of art and a technical matter to be established by experts. The lead plaintiff provision in the PSLRA does not use the term "damages" but instead, "largest financial interest."

192 F.R.D. at 661.

The Court does not consider Ribozyme's analysis persuasive in light of the number of district courts relying upon the 90-day average trading price in comparing claimed losses. See, e.g., In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427 (E.D. Va. 2000) (using 90-day period after the close of the class period to determine largest financial interest); Steiner v. Nat'l Auto Credit, 1998 U.S. Dist. LEXIS 21804, at *12 (N.D. Ohio July 16, 1998) (using the "mean trading price," or the average of the daily trading price of the security "during the 90 day period," to determine the largest financial interest in the case).[10] In fact, the Court is unaware of any other

---

[10] The Ribozyme court stated that it relied on several non-published opinions in its district that have employed the "retention value" method for determining the largest financial interest pursuant to the PSLRA. See Ribozyme, 192 F.R.D. at 660 (citing In re New Era Networks, Inc. Sec. Litig., Civil Action No. 99-WM-473 (Colo. 1999); In re Samsonite Corp. Sec. Litig., Civil Action No. 98-K-1878 (Colo. 1998); In re Boston Chicken Sec. Litig., Civil

opinion holding that the "retention value" method is the only appropriate method of calculating damages.[11]

Moreover, the Court finds that Market Street failed to follow the directive at the April 12, 2002 hearing to articulate with clarity and specificity the bases and methods for calculating its own losses. Market Street's original certification and loss calculation, unlike those of other lead plaintiff movants, failed to provide sufficient information for the Court to analyze the basis for its claimed financial interest. Furthermore, despite its sharp criticism of other lead plaintiff movants' calculations, Market Street has not provided any additional information to supplement its original submission in the four rounds of briefing following its April 1, 2002 motion.

In accordance with the PSLRA, the Court finds that Mr. Meruelo is the WCG Subclass lead plaintiff movant with the "largest financial interest" in the outcome of the litigation. The Court's determination is based on the following findings: (1) Mr. Meruelo's loss calculations have survived scrutiny and are permissibly calculated using the 90-day average trading price under the PSLRA; (2) the Watkins Group's claimed losses are significantly less than those of Mr. Meruelo; and (3) the claimed losses of Market Street are also significantly less than those of Mr. Meruelo.

---

Action No. 97-WM-1308 (Colo. 1997); In re New Era of Networks, Inc. Sec. Litig., Civil Action No. 99-WM-1274 (Colo. 1999)). The Court finds that each of these four opinions is inapposite because none of them endorses the "retention value" method or even mentions how the largest financial interest was determined. See id. Furthermore, two of the cases, New Era, Civil Action No. 99-WM-473; and Samsonite, Civil Action No. 98-K-1878, involved unopposed motions for the appointment of lead plaintiff, thereby explaining the absence of any discussion regarding the appropriate method for determining which movant had the "largest financial interest."

[11] The Court finds Market Street's attacks on Mr. Meruelo's use of the 90-day average trading price notable given Market Street's failure to make the argument before final briefs were submitted on June 6, 2002. This failure is particularly perplexing in light of the number of lead plaintiff movants calculating "losses" and financial interest using that method.

Having determined that Mr. Meruelo has the largest financial interest in the outcome of the litigation, the Court turns to whether Mr. Meruelo satisfies the requirements of Fed. R. of Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Many courts agree, however, that a "wide-ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification. This inquiry, therefore, focuses on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4)." Lax, 1997 WL 461036, at *6 (internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d 427; Aronson, 79 F. Supp. 2d at 1158 (citations omitted) (holding that, at the lead plaintiff appointment stage, "all that is required is a 'preliminary showing' that the lead plaintiff's claims are typical and adequate.").

Market Street claims Mr. Meruelo's losses are not typical of those of the WCG Subclass under Rule 23(a) because Mr. Meruelo is subject to unique defenses as a result of his purchases of securities after the alleged disclosure of the fraud on January 29, 2002. In support of this position, Market Street quotes a brief purportedly filed by Mr. Meruelo's counsel, Milberg Weiss, on behalf of another client in an unrelated case. Market Street argues that Mr. Meruelo's purchases of WCG securities on January 29, 2002 are similar to the purchases of the lead plaintiff movant in Enron where the court determined the movant was subject to unique defenses and therefore was atypical because it purchased millions of shares of Enron stock after the disclosure of the fraud. Enron, 2002 WL 530588, at *22; see also Berwecky v. Bear, Stearns & Co., Inc., 197 F.R.D. 65 (S.D.N.Y. 2000) (holding that a person who increases his holding after

11

revelation of the fraud is subject to unique defenses that preclude him from serving as class representative); Kreindler v. Sambo's Rest., Inc., 1985 U.S. Dist. Lexis 23388 (S.D.N.Y. 1985) (same).

Mr. Meruelo contends that his purchases of WCG securities on January 29, 2002, the last day of the class period, can be distinguished from those of the lead plaintiff movant in Enron, the Florida State Board of Administration ("FSBA"). Mr. Meruelo explains that the FSBA's purchases of Enron securities were made on its behalf by its investment advisor, Alliance Capital Management Holding, well after the first Enron shareholder suits were filed against Enron and after the announcement of the SEC investigation into Enron.

Under Fed. R. Civ. P. 23(a)(3), the claims of the representative parties must be typical of those of the putative class. Typicality is achieved where the named plaintiff's claims arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." Enron, 2002 WL 530588, at *8 (citations omitted). Even though the typicality requirement is not satisfied when the "plaintiff's factual or legal stance is not characteristic of that of other members," id., at *13 (citations omitted), the existence of minor distinctions will not preclude the typicality requirement from being met, Olsten, 3 F. Supp. 2d at 296; see also Nice Sys., 188 F.R.D. at 217; Enron, 2002 WL 530588, at *13.

The Court finds that Mr. Meruelo's purchases of WCG stock on January 29, 2002, the first day the alleged fraud was disclosed, may be distinguished from the purchases of FSBA because the purchases of FSBA occurred "after the initial public disclosure regarding [its] overstatement of its assets and partnership liabilities, after the first suits in this consolidated action were filed, and after the SEC announced that it was investigating [the company]." Enron, 2002 WL 530588, at *22. In this case, the purchases upon which Market Street seeks to disqualify Mr. Meruelo occurred on January 29, 2002, the date the plaintiffs claim the first WMB

12

or WCG press release regarding the alleged fraud was issued.  In Enron, the court found that FSBA's claims were atypical because, unlike this case, FSBA's purchases occurred so long after the first disclosure of the fraud that FSBA, unlike other investors, did not buy the stock relying upon either the market or statements by Enron or its agents.[12]  The Court finds that Mr. Meruelo's purchases were not atypical so as to disqualify him from serving as lead plaintiff.

The Watkins Group, seeking to be appointed lead plaintiff on behalf of WCG bondholders, argues that its interests will not be adequately protected by Mr. Meruelo, or any other equity holder lead plaintiff.  The Watkins Group objects on the following grounds: (1) WCG shareholders do not have standing to pursue claims on behalf of WCG bondholders; and (2) because the interests of WCG shareholders and WCG bondholders are divergent, the WCG bondholders will not be adequately represented by a shareholder lead plaintiff.

To the extent the Watkins Group's first argument relates to the typicality of Mr. Meruelo's claims, the Court finds that Mr. Meruelo's claims are typical because the claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members."  See Lax, 1997 WL 461036, at *6 (N.D. Ill. 1997); see also Enron, 2002 WL 530588, at *13 ("When plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times.") (internal quotations omitted).  Moreover, the Court finds that, insofar as the appointment of Mr. Meruelo

---

[12]  The lead plaintiff movants, here, dispute whether the market, and Mr. Meruelo, had notice of the alleged fraud when the securities were purchased.  As the Court explained above, an extended inquiry and factual determination into the exact moment investors were on notice is inappropriate and unnecessary at this stage of the litigation and will not be taken up here.

13

as WCG Subclass lead plaintiff presents standing issues, those issues can be resolved by the filing of an amended complaint.

The Watkins Group's second attack goes to the adequacy of Mr. Meruelo, or any shareholder lead plaintiff movant, to represent the interests of WCG bondholders. The Watkins Group, stressing the significance of the WCG bankruptcy, claims that it should also be appointed lead plaintiff in order to "ensure that the interests of bond purchasers are adequately represented and protected during any settlement negotiations, and particularly during any allocation of funds in the event of recovery." Watkins Group Reply Mem. (Jun. 6, 2002), at 4.

Under Fed. R. Civ. P. 23(a)(4), class representatives must adequately represent the interests of the putative class. This requirement is satisfied where: "(1) class counsel is qualified, experienced and generally able to conduct the litigation; (2) the class members do not have interests that are antagonistic to one another; and (3) the class has sufficient interest in the outcome of the case to ensure vigorous adequacy." Olsten, 3 F. Supp. 2d at 296 (citations and internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d at 435-36. In other words, "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." Nice Sys., 188 F.R.D. at 219.

The Court finds that Mr. Meruelo's representation meets the Rule 23(a)(4) standard for adequacy. First, the Court finds Milberg Weiss, Weiss & Yourman, and Morrel West, the counsel selected by Mr. Meruelo, to be qualified and experienced lawyers who are unquestionably capable of conducting the litigation on behalf of the WCG Subclass. Second, the Court finds that any problems due to alleged conflicts of interest between WCG's debt and equity holders amounts to mere speculation at the present time. At this stage of the litigation, the

14

holders of both types of securities have the common goal of establishing the omissions and misrepresentations allegedly made to the market. See generally Enron, 2002 WL 530588, at *13. The Court further finds that the inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in an unnecessary and undesirable weakening of the bargaining power of the WCG Subclass. See Nice Sys., 188 F.R.D. at 220 ("Representation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation.") (internal quotations omitted). Finally, the Watkins Group's contention that Mr. Meruelo, or another shareholder lead plaintiff, will not vigorously pursue the claims of the bondholder class members is unsubstantiated. The Court finds that Mr. Meruelo's own financial stake in the litigation provides an adequate incentive for him to vigorously prosecute the action on all fronts. See generally Nice Sys., 188 F.R.D. at 219.

The final issue with respect to the appointment of Mr. Meruelo as lead plaintiff is whether any lead plaintiff movant has successfully rebutted the presumption that Mr. Meruelo is the "most adequate plaintiff." Under the PSLRA, the presumptive lead plaintiff may only be rebutted upon proof that the plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Both Market Street's and the Watkins Group's arguments for the disqualification of Mr. Meruelo on the grounds that his claims are atypical or inadequate under Rule 23(a) may be construed as rebuttal challenges under the PSLRA. See id. The Court addressed and rejected these arguments above. Therefore, the Court finds that the presumption that Mr. Meruelo is the "most adequate plaintiff" for the subclass has not been rebutted. Accordingly, the Court hereby appoints Mr. Meruelo as the lead plaintiff for the WCG subclass.

15

### B.  Appointment of Counsel for the WCG Subclass

The Court now turns to the approval of lead counsel for the WCG Subclass.  As noted above, the Court finds that Mr. Meruelo's selections, Milberg Weiss, Weiss & Yourman, and Morrel West, are qualified, experienced counsel who will adequately represent the interests of the class.  Accordingly, the Court approves Mr. Meruelo's selection of Milberg Weiss and Weiss & Yourman as co-lead counsel, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses.  See Lax, 1997 WL 461036, at *7 (noting the use of co-lead counsel should not result in increased attorneys' fees and expenses).  The Court also approves Mr. Meruelo's selection of Tulsa law firm Morrel West as local counsel for the WCG Subclass.

### III

### A.  Appointment of Lead Plaintiff for the WMB Subclass

On April 1, 2002, motions seeking lead plaintiff status were filed by HGK and Teamsters Local 710 Pension Fund and Health & Welfare Fund ("Local 710"); both movants now seek to be appointed lead plaintiff for the subclass of purchasers of WMB securities ("WMB Subclass").  HGK and Local 710 submitted motions, as required by the PSLRA, within sixty days from the January 29, 2002 publication of the notice of the pendency of this class action.  See 15 U.S.C. § 78u-4(a)(A)(i)(II).  The potential lead plaintiffs for the WMB Subclass, therefore, both satisfy the first requirement for becoming the presumptive "most adequate plaintiff."

The Court must next determine which movant "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  The financial interest claimed by the two lead plaintiff movants for the WMB Subclass are as follows:

16

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| HGK | $3,774,142.00 |
| Local 710 | $  146,166.00[13] |

As previously discussed, determining which lead plaintiff movant has the largest financial interest in the litigation is, generally, the most significant inquiry for the Court in appointing a lead plaintiff. See, e.g., Aronson, 79 F. Supp. 2d at 1157. In the case of the WMB Subclass, however, HGK's alleged losses dwarf those of Local 710, and Local 710 has failed to demonstrate that HGK's claimed WMB holdings or losses are erroneously calculated or otherwise overstated. Accordingly, the Court finds that HGK has the "largest financial interest in the outcome of the litigation." See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

Local 710 argues that it should be appointed a separate lead plaintiff for a subclass of WMB bondholders.[14] Asserting similar justifications as those argued by the Watkins Group, Local 710 contends that no shareholder lead plaintiff movant has the standing required to pursue claims on behalf of the bondholders, and that Local 710's interests will not be adequately represented by a shareholder lead plaintiff.[15]

---

[13] HGK's losses were suffered in connection with its purchase of shares of WMB common stock and were determined after deducting gains from the sale of its WCG shares received as dividends; Local 710's losses were suffered in connection of its purchases of WMB notes.

[14] In its memoranda addressing the appointment of lead plaintiff, Local 710 urges the Court to appoint it lead plaintiff of a separate subclass of purchasers of WMB notes. The Court denied Local 710's request for the creation of a separate subclass in its June 21, 2002 order (Docket No. 123), and will not address that issue again here.

[15] It is unclear whether Local 710's attack is based on the grounds of typicality and adequacy under Rule 23 or an attack on HGK as the presumptive lead plaintiff.

17

As noted above, in determining the most adequate plaintiff, the Court must address Rule 23(a)'s typicality and adequacy requirements. The Court finds that HGK's representation meets the Rule 23(a) standards for typicality and adequacy. First, the Court finds that HGK's claims are typical of the WMB bondholders because the claims asserted by HGK on behalf of the shareholder plaintiffs "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6. As discussed above, the Court finds that, to the extent the appointment of HGK as WMB Subclass lead plaintiff presents standing issues, those issues can also be resolved at the appropriate time by the filing of an amended complaint. Second, the Court finds that HGK's representation of the class is adequate for the reasons identified previously with respect to appointment of a lead plaintiff for the WCG Subclass because HGK: (1) has selected qualified and experienced counsel; (2) does not have any present conflicts of interest with the WMB bondholders; and (3) will vigorously prosecute the action.

Accordingly, because HGK (1) filed its lead plaintiff application within 60 days of the notice of the pendency of the action; (2) has been determined by the Court to have the largest financial interest in the litigation's outcome; and (3) satisfies the requirements of Rule 23, HGK is presumed to be the "most adequate" plaintiff. The Court finds that Local 710 has not successfully rebutted this presumption or otherwise shown that HGK cannot or will not adequately represent the class. Accordingly, the Court hereby appoints HGK as the lead plaintiff for the WMB Subclass.

### B. Appointment of Counsel for the WMB Subclass

The Court now turns to the approval of lead counsel for the WMB Subclass. The Court finds that HGK's selections, Schoengold & Sporn and the Seymour Law Firm, are qualified,

18

experienced counsel who will adequately represent the interests of the class.  Accordingly, the Court hereby approves HGK's selection of Schoengold & Sporn and the Tulsa law firm, the Seymour Law Firm, as co-lead counsel for the subclass of purchasers of WMB securities, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses.  See Lax, 1997 WL 461036, at *7.

IV

On March 15, 2002, the parties filed a Joint Stipulation and Proposed Scheduling Order to govern the timing of submissions following the entry of the Court's order appointing lead plaintiff and lead counsel.  Pursuant to this Order, and in accordance with that Joint Stipulation, the Court hereby orders the following:

1.  Lead Plaintiffs for the WCG and WMB Subclasses shall file consolidated amended complaints on behalf of their respective subclasses incorporating all causes of action on behalf of all putative subclass members no later than 45 days from this order;

2.  Defendants shall have 45 days from service of the consolidated amended complaints to file responsive pleadings;

3.  Lead Plaintiffs shall have 45 days to file any oppositions to the responsive pleadings; and

4.  Defendants shall have 15 days to reply to Plaintiffs' opposition.

IT IS SO ORDERED.

This 8TH day of July, 2002.

Sven Erik Holmes
United States District Judge

19